UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BONDEX INTERNATIONAL, INC., et al. | ) | |
| | ) | Case No. 1:03-CV-1322 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | JUDGE ANN ALDRICH |
| | ) | |
| HARTFORD ACCIDENT AND INDEMNITY | ) | Magistrate Judge Vecchiarelli |
| COMPANY, et al. | ) | |
| | ) | |
| Defendants. | ) | MEMORANDUM AND ORDER |
| | ) | |
| | ) | |

Before this court are a number of motions for summary judgment on the various claims

among the parties. The following motions filed by plaintiffs Bondex International, Inc. ("Bondex"),

Republic Powdered Metals, Inc.'s ("Republic"), and RPM, Inc. ("RPM") are pending: (1) the

plaintiffs' motion for partial summary judgment [Doc. No. 593] against defendant Century

Indemnity Company ("Century"); (2) the plaintiffs' motion for partial summary judgment [Doc. No.

596] against defendant Columbia Casualty Company ("Columbia"); (3) the plaintiffs' motion for

partial summary judgment [Doc. No. 597] against defendant Continental Casualty Company

("Continental"); (4) the plaintiffs' motion for partial summary judgment [Doc. No. 595] against

Allstate Insurance Company ("Allstate"); (5) the plaintiffs' motion for partial summary judgment

[Doc. No. 594] against defendant Mt. McKinley Insurance Company ("Mt. McKinley"); (6) the

plaintiffs' motion to dismiss Mt. McKinley's amended counterclaim [Doc. No. 748]; and (7) third

party defendants Glenn Bowers' ("Bowers") and Bowers Orr LLP's ("Bowers Orr") motion to

dismiss Mt. McKinley's amended counterclaim [Doc. No. 776].

The following motions filed by the defendants are also pending: (8) Century's motions for

summary judgment [Doc. Nos. 573 and 574] against the plaintiffs, which are joined by Columbia

and Continental [Doc. No. 650]; (9) Continental and Columbia's motion for partial summary judgment [Doc. No. 556] against the plaintiffs; (10) Allstate's motion for summary judgment [Doc. No. 586] against the plaintiffs; and (11) Mt. McKinley's motion for summary judgment [Doc. No. 551] against the plaintiffs, which is joined by Columbia and Continental [Doc. No. 686].

In addition, third party defendants United States Fidelity and Guaranty Company ("USF&G") and Travelers Casualty and Surety Company ("Travelers") have filed (12) a motion for summary judgment [Doc. No. 591] wherein they seek dismissal of all claims asserted against them.

For the following reasons, the court denies the plaintiffs' motions for summary judgment and grants the defendants' motions for summary judgment. Because the claims against USF&G and Travelers are contingent upon the plaintiffs' success against the defendants, USF&G and Travelers' motion for summary judgment is also granted. This court also grants the plaintiffs' motion to dismiss Mt. McKinley's amended counterclaim. Finally, this court enters judgment as a matter of law on all remaining claims and counterclaims and dismisses the action. Consequently, the remaining motions [Doc. Nos. 711, 752, 771, 785, 813, 829, 830, 835, 857] are dismissed as moot.

I.    **Plaintiffs' and Defendants' Motions for Summary Judgment**

    *A.    Factual Background*

This case concerns insurance policies issued by Allstate, Century, Continental, Columbia, and Mt. McKinley or their predecessors in interest and whether those policies have been exhausted by claims filed against RPM, Bondex, and Republic for asbestos-related personal injuries. The central issue raised in this case is whether asbestos-related claims arising out of products manufactured by The Reardon Company ("Reardon") prior to Reardon's acquisition by what would become RPM are subject to coverage limits in insurance policies issued by the defendants. The

plaintiffs allege in their complaint that because claims arising out of materials manufactured by Reardon prior to its acquisition are not claims arising out of materials manufactured by the policies' "Named Insured" or "Insured," the limits in the policies do not apply and the plaintiffs are entitled to coverage without limit on claims arising out of materials manufactured by Reardon prior to its acquisition.

1.     *Corporate Structure and History*

On or about March 1, 1966, Republic entered into an agreement with Reardon to acquire substantially all of Reardon's assets (the "1966 transaction"). Reardon, a company founded in 1883 and incorporated in Missouri in 1914, manufactured and sold a number of products containing asbestos. Pursuant to a purchase agreement and an assumption agreement, Republic assumed liability for all products manufactured or sold by Reardon should those products cause bodily injuries after the date of the purchase agreement.

Under the asset purchase agreement, Reardon received cash for its assets, not shares of Republic stock. The 1966 transaction, however, was structured so that several Reardon shareholders lent money to Republic in exchange for 15-year, six-percent subordinated notes that could be converted to Republic stock.

At the same February 28, 1966 meeting where Reardon shareholders approved the 1966 transaction, the shareholders also approved Reardon's dissolution and liquidation plan. After its shareholders approved the dissolution and liquidation plan, Reardon changed its name to Nodraer Liquidating Company ("Nodraer"), filed its articles of dissolution on April 19, 1966, and filed its articles of liquidation on December 30, 1966. Despite the dissolution and liquidation of Reardon, Republic continued Reardon's business as a division within Republic called the "Reardon Division."

The Reardon Division was an internal division which had no separate legal existence from Republic. Republic maintained many of Reardon's same assets, products, and facilities.  Although Reardon's management and board did not assume positions with Republic after the 1966 transaction, Reardon employees were rehired as employees of the Reardon Division.  To the public, little had changed after the 1966 transaction:  Republic blurred the distinction between itself and Reardon by stating that Republic was founded in 1883 and indicating that Republic was incorporated in Missouri in 1914–facts associated with Reardon's founding and incorporation.  Moreover, Republic continued manufacturing and selling many of Reardon's products, using Reardon's formulas, and advertising with Reardon's trade names, such as "Bondex" and "The Reardon Company."

On November 9, 1971, Republic changed its name to RPM, Inc. ("RPM").  RPM created two wholly-owned subsidiaries called Bondex International, Inc. ("Bondex") and Republic Powdered Metals, Inc. ("New Republic").  On May 31, 1972, Republic transferred the assets and liabilities of Reardon to Bondex for $1.00 and transferred the assets and liabilities of Republic to New Republic. At that point, RPM became a holding company for Bondex and New Republic.  These changes constituted an internal restructuring that had no impact on RPM's business or product line.

> 2.      *Asbestos Bodily Injury Claims*

In 1981, a plaintiff claiming to have been injured by products manufactured by Bondex commenced litigation against Bondex.  Similar suits were filed throughout the 1980's, 1990's, and 2000's.  Each plaintiff alleged bodily injury caused by exposure to asbestos emanating from products manufactured by Reardon, RPM, Bondex, or New Republic.  By 2006, approximately 15,000 bodily injury claims had been filed involving approximately 32,000 individual plaintiffs.

> 3.      *Insurance Coverage*

RPM had insured itself and its subsidiaries against such claims under liability insurance policies issued by companies succeeded by Allstate, Century, Continental, Columbia, and Mt. McKinley.[1]  These policies provide defense and indemnity coverage to the policies' "Named Insured" or "Insured," in other words, RPM, Bondex, and New Republic.  The policies also contain aggregate limits of liability which applied to "products hazard" and "completed operations hazard" claims, which are claims arising out of products manufactured by the "Named Insured" or "Insured." The policies, however, contain no aggregate limit of liability for claims that do not fall within the "products hazard" and "completed operation hazard" categories.  Such unaggregated claims include claims for bodily injuries which were not caused by products manufactured by the "Named Insured" or "Insured" but rather by other companies for which the "Named Insured" or "Insured" were contractually liable.

The first policy issued by Century contains definitions typical of the policy definitions at issue in this case.  Century defined "Named Insured," "Named Insured's Products," "Products Hazard," and "Completed Operations Hazard" as follows:

> "Named Insured" means the organization named in the declaration of this policy and includes: (1) any subsidiary company (including subsidiaries thereof) and any other company under their control and active management at the inception date of this policy; (2) new organizations acquired by the Named Insured during the policy period, through consolidation, merger, purchase of the assets of, or assumption of control and active management; provided such acquisition or assumption is reported to INA within sixty days after it is effected and provided further such acquisition is endorsed on this policy.
>
> . . .

---

[1]Hartford Accident and Indemnity Company ("Hartford") also was an insurer, but the parties have already settled the claims against Hartford.

"Named Insured's products" means goods or products manufactured, sold, handled or distributed by Named Insured or by others trading under his name, including any container thereof (other than a vehicle) but "Named Insured's products" shall not include a vending machine or any property other than such a container, rented to or located for use of others but not sold.

. . .

"[P]roducts Hazard" includes personal injury and property damage arising out of the Named Insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the personal injury or property damage occurs away from premises owned by or rented to Named Insured after physical possession of such products has been relinquished to others.

. . .

"[C]ompleted operations hazard" includes personal injury and property damage arising out of operations or reliance upon a representation or warranty made at anytime with respect thereto, but only if the personal injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the Named Insured. "Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:

> (1) when all operations to be performed by or on behalf of Named Insured under the contract have been completed,
> (2) when all operations to be performed by or on behalf of the Named Insured at the site of the operations have been completed, or
> (3) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete shall be deemed completed.

The completed operations hazard does not include personal injury or property damage arising out of

> (a) operations in connection with the transportation of property, unless the personal injury or property damage arises out of a condition in or on a vehicle created by the loading or unloading thereof,

-6-

(b) the existence of tools, uninstalled equipment or abandoned or unused
materials.

As the lawsuits were filed and litigated, the plaintiffs submitted claims to the defendants. For
years, these claims were categorized as products hazards claims.  In due time, the defendants
claimed that the products hazard aggregate limits had been exhausted by the plaintiffs.  The
plaintiffs, however, argued that the aggregate limits were not exhausted because the claims arose
from products manufactured by Reardon.  Because Reardon was not a "Named Insured" or
"Insured," the plaintiffs argue, the claims should not have been applied towards the aggregate limits.
The plaintiffs filed suit on July 3, 2003.

### B.     Standards

### 1.     Choice of Law

Under the well-known Erie rule, when a federal court sits in diversity, the court "must apply
the same substantive law that would be applied if the action had been brought in a state court of the
jurisdiction in which the federal court is located."  *Equitable Life Assur. Soc. of U.S. v. Poe*, 143
F.3d 1013, 1016 (6th Cir. 1998) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)).  In *United
States v. A.C. Strip*, 868 F.2d 181, 184 (6th Cir. 1989), a case brought pursuant to diversity
jurisdiction, the court recognized that "[i]n the absence of a provision to the contrary, a policy issued
in Ohio is governed by Ohio law" (citing *Celina Mut. Ins. Co. v. Sadler*, 6 Ohio App.2d 161, 165-66
(Ohio App. 3 Dist. 1966)).  The record before this court indicates that the policies were issued in
Ohio.  Moreover, the parties to this diversity action have made numerous references to Ohio law in
their briefs, and Magistrate Judge Hemann also determined that Ohio law should apply to this action
[Doc. No. 335].  This court, therefore, finds that Ohio law governs.

### 2.     Summary Judgment

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986); *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004).  If the movant succeeds, the burden then shifts to the nonmoving party to demonstrate the existence of a material dispute as provided in Rule 56(e)(2):

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must–by affidavits or as otherwise provided in this rule–set out specific facts showing a genuine issue for trial.

FED. R. CIV. P. 56(e)(2); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).  Parties opposing summary judgment must go beyond the pleadings and produce some type of evidentiary material in support of their position.  *See Celotex,* 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, this Court must view all of the evidence in the light most favorable to the nonmoving party.  *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970); *Hamby v. Neel,* 368 F.3d 549, 556 (6th Cir. 2004); *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson,* 477 U.S. at 248.  An issue is "genuine" if the evidence is such that a reasonable juror "could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict" or whether the evidence is "so one-sided that [the moving party] must prevail as a matter of law."  *Id.* at 252.

     *3.     De Facto Merger*

In general, "the purchaser of a corporation's assets is not liable for the debts and obligations of the seller corporation."  *Welco Indus., Inc. v. Applied Cos.,* 67 Ohio St.3d 344, 346 (1993). Courts have recognized, however, several exceptions to this general rule.  A corporation that purchases the assets of another may be liable for its predecessor's contractual liabilities if "(1) the buyer expressly or impliedly agrees to assume such liability; (2) the transaction amounts to a *de facto* consolidation or merger; (3) the buyer corporation is merely a continuation of the seller corporation; or (4) the transaction is entered into fraudulently for the purpose of escaping liability." *Id.*at 347.

"A de facto merger is a transaction that results in the dissolution of the predecessor corporation and is in the nature of a total absorption of the previous business into the successor." *Id.* at 349.  Ohio courts evaluate several factors in determining whether an asset sale constitutes a de facto merger:

> The hallmarks of a de facto merger include (1) the continuation of the previous business activity and corporate personnel, (2) a continuity of shareholders resulting from a sale of assets in exchange for stock, (3) the immediate or rapid dissolution of the predecessor corporation, and (4) the assumption by the purchasing corporation of all liabilities and obligations ordinarily necessary to continue the predecessor's business operations.

*Id.* (quoting *Turner v. Bituminous Cas. Co.*, 397 Mich. 406, 420 (1976)).

### C.    *Analysis of Counts 3 and 6*

In Count 3 of the  first amended complaint, the plaintiffs seek declaratory judgment against all defendants stating that aggregate limits of liability for asbestos bodily injury claims have not been exhausted.  In Count 6 of the first amended complaint, the plaintiffs claim that each defendant

-9-

breached its contract with the plaintiffs.  The resolution of each of  these counts requires the court to determine whether the 1966 transaction constituted a de facto merger.

       1.     *Whether a De Facto Merger Occurred*

The defendants have argued that this court should apply the doctrine of de facto merger to this case.  They argue that the 1966 transaction constituted a de facto merger between Reardon and Republic.  As such, the term "Named Insured" or "Insured" under the disputed policies includes Reardon.  Under this theory, claims of bodily injury caused by Reardon products constitute product hazard claims or completed operations hazard claims that apply towards the aggregate limits.  The defendants claim that they are not obligated to further indemnify the plaintiffs because the Reardon claims were products hazard claims or completed operations hazard claims and the aggregate liability limits have been reached.

The plaintiffs, however, argue that the court should not apply the doctrine of de facto merger.  First, they argue that the doctrine of de facto merger is an equitable construct that is only applicable when there is, and only on behalf of, an uncompensated plaintiff or a frustrated creditor  Because this case involves neither an uncompensated plaintiff nor a frustrated creditor, the plaintiffs argue, the doctrine is inapplicable.

In support of this proposition, the plaintiffs cite the Ohio Supreme Court's decision in *Welco*.  This court, however, does not read *Welco* as limiting the doctrine in such a manner.  Although the doctrine might be applicable in cases involving an uncompensated plaintiff or a frustrated creditor, nowhere in *Welco* does the court state that the doctrine is only applicable in such cases.

The plaintiffs' citation to the non-binding decision in *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41 (2d Cir. 2003), in further support of limiting the application of the de facto merger

-10-

doctrine is equally unpersuasive.  The cited text merely states that "[t]he purpose of the doctrine of de facto merger is to avoid [the] patent injustice which might befall a party simply because a merger has been called something else."  *Id.* at 46 (internal quotations omitted).  This purpose of the doctrine cited by the plaintiffs, however, can be read in favor of the defendants.  Avoiding a patent injustice because the 1966 transaction was labeled an asset sale instead of a merger is exactly what the defendants hope to accomplish by seeking this court's application of the doctrine to the facts at hand.

Finally, the plaintiffs cite *Chrystler Corp. v. Ford Motor Co.*, 972 F.Supp. 1097 (E.D. Mich. 1997), in support of limiting the application of the doctrine to cases of uncompensated plaintiffs or frustrated creditors.  There, the district court, applying Michigan law, found that "[t]he *de facto* merger doctrine seeks to prevent one company from transferring its assets to a second company and dissolving, thus sheltering its assets from creditors, and then continuing its former business as the second company."  *Id*. at 1111.  While this may be one purpose of applying the doctrine, the cited court did not state that creditor protection is the only purpose of applying the doctrine.  Nonetheless, even if creditor protection were the only purpose of applying the doctrine under Michigan law, the same would not necessarily be true under Ohio law.  As this court previously stated, the Ohio Supreme Court did not expressly limit the application of the de facto merger doctrine to such narrow circumstances.

The plaintiffs also claim that there is no legal authority for applying the de facto merger doctrine to the construction of a contract.  One recent case, however, has applied the doctrine of de facto merger to determine the meaning of the term "Named Insured."  In *Greenway Ctr., Inc. v. Essex Ins. Co.*, No. 3:04cv1143, 2008 WL 3165874 (M.D. Pa. Aug. 6, 2008), the court found that a

-11-

plaintiff's de facto merger with an insurance policy's "Named Insured" required the insurer to indemnify and defend the plaintiff as a "Named Insured." *Id.* at *7.  The plaintiffs' contention that this court's application of the doctrine would be unprecedented in this context is, therefore, unfounded.

The plaintiffs further argue that even if the court, by applying the de facto merger doctrine, were to determine that Reardon was a "Named Insured" or "Insured," the claim would not arise out of the "Named Insured's Products" or "Insured's Products."  In support of this proposition, the plaintiffs look to drafting documents of the Insurance Services Office ("ISO"), a trade association servicing the insurance industry in the United States.  This court, however, finds no need to consider the ISO's drafting history, as the terms used in the policies are unambiguous.  When an insurance policy is unambiguous, the court "may look no further than the four corners of the insurance policy to find the intent of the parties."  *McDaniel v. Rollins*, No. 1-04-82, 2005 WL 1421754, at *7 (Ohio App. 3 Dist. June 20, 2005) .  An ambiguity exists "only when a provision in a policy is susceptible of more than one reasonable interpretation."  *Hacker v. Dickman*,75 Ohio St.3d 118, 119-20 (1996).  Here, the policies' definitions of "Named Insured's Products" or "Insured's Products" are not ambiguous if the definition of "Named Insured" or "Insured"  is determined.  The plaintiffs do not present extrinsic evidence to show how the terms "Named Insured's Products" or "Insured's Products" could be ambiguous if the terms "Named Insured" or "Insured" were determined to include Reardon.

In sum, the plaintiffs have proffered no adequate reason for this court to refrain from applying the doctrine of de facto merger to this case.  This court must, therefore, now turn to

analyzing each relevant factor used to determine whether the 1966 transaction constituted a de facto merger under Ohio law.

The first hallmark of a de facto merger is the continuation of the predecessor's business activity and corporate personnel.  *Welco*, 67 Ohio St.3d at 349.  It is clear that the 1966 transaction resulted in a continuation of Reardon's business activity.  After the 1966 transaction, Reardon became a division of Republic.  Republic maintained Reardon's same assets and facilities and continued manufacturing many of Reardon's products using Reardon's formulas.  Republic continued using Reardon's trade names.  Republic continued employing Reardon's employees.  After the 1966 transaction, Republic held itself out as being founded in 1883 and incorporated in Missouri in 1914, the dates and place of Reardon's formation and incorporation, respectively.

On the other hand, it is equally clear that there was no continuity of corporate personnel after the 1966 transaction, as Republic did not absorb Reardon's management and or place Reardon officers or directors on its board.  Nevertheless, the overall continuity of Reardon's business activity after the 1966 transaction weighs in favor of a finding that a de facto merger did occur pursuant to the 1966 transaction, despite the fact that Reardon's corporate personnel did not continue at Republic.

The second hallmark of a de facto merger is often narrowly described as "a continuity of shareholders resulting from a sale of assets in exchange for stock."  *Id.*  As described, this factor is not satisfied in the present case because the 1966 transaction involved a sale of assets for cash.  That Reardon's and Republic's shareholders exhibited no continuity, however, is not fatal to a finding of de facto merger.  In *Turner*, the case from which the court in *Welco* adopted the de facto merger test, the court stated that "[t]he presence of stock as consideration should be one factor to use to

-13-

determine whether there exists a sufficient nexus between the successor and predecessor corporations to establish successor liability. However, the absence of an exchange of stock should not be conclusive." 397 Mich. at 422. Several courts interpreting the decision in *Welco* agree that the continuity of stock ownership is not a dispositive requirement:

> The Supreme Court of Ohio has never stated that it is an absolute requirement that all of the "hallmarks" of a *de facto* merger be present before concluding that a particular transaction is in fact a *de facto* merger. Further, despite that court's acknowledgment that one court had found that an assets-for-stock transfer is the *sine qua non* of a *de facto* merger, the court has never stated that this is the *only* transaction in which there exists continuity of shareholders. A rule mandating the presence of all of the "hallmarks" of a *de facto* merger or always requiring an assets-for-stock transaction would be too rigid, as it would likely except some "transaction[s] that result[] in the dissolution of the predecessor corporation and [that] [are] in the nature of a total absorption of the previous business into the successor." *Welco*, 617 N.E.2d at 1134. Such a rule would dilute the de facto merger doctrine, which recognizes transactions that are mergers in fact without an official declaration of such.

*Cytec Indus., Inc. v. B.F. Goodrich Co.*, 196 F.Supp.2d 644, 658 (S.D. Ohio 2002); *see also Permasteelisa CS Corp. v. The Airolite Co.*, No. 2:06-CV-569, 2007 WL 4615779, at *11 (S.D. Ohio Dec. 31, 2007) ("[T]he Court cannot conclude, as a matter of law, that the absence of a stock-for-assets transaction is fatal to Plaintiff's *de facto* merger claim."); *Kennedy v. City of Zanesville, Ohio*, 505 F.Supp.2d 456, 479 (S.D. Ohio 2007) ("Although there is no 'continuity of shareholders' between the County and the EMWA because neither entity has shareholders and because there was not an assets-for-stock transaction, the absence of such a transaction does not necessarily result in the conclusion that the transaction in question was not a de facto merger."). Instead, these decisions focused on "the nexus between the predecessor corporation and successor corporation that the continuity of shareholders 'hallmark' seeks to require." *Cytec*, 196 F.Supp.2d at 659. In addition to the overall continuity of the business operations under Republic, the Reardon shareholders' loans made to Republic in exchange for convertible subordinated notes suggests the existence of a strong

-14-

and continuous nexus between Reardon and Republic after the 1966 transaction.  The second factor of the de facto merger test, therefore, is satisfied because a sufficient nexus existed between the predecessor corporation and the successor corporation.

The third hallmark of a de facto merger is the rapid dissolution of the predecessor corporation.  *Welco*, 67 Ohio St.3d at 349.  Reardon's shareholders approved both the 1966 transaction and the company's dissolution and liquidation plan on the same day and at the same shareholder meeting.  After the 1966 transaction was finalized, Reardon changed its name to Nodraer (Reardon spelled backwards).  Within weeks, the company filed its articles of dissolution. Within the year, the company filed its articles of liquidation.  The rapid dissolution of Reardon weighs in favor of a finding that a de facto merger occurred pursuant to the 1966 transaction.  Thus, the third factor of the de facto merger test is satisfied.

Finally, the fourth hallmark of a de facto merger is the"assumption by the purchasing corporation of all liabilities and obligations ordinarily necessary to continue the predecessor's business operations."  *Id.*  Here, both parties agree that the asset purchase agreement and the assumption agreement resulted in Republic's assumption of Reardon's liabilities and obligations. The fourth factor of the de facto merger test is, therefore, satisfied.

The evidence submitted by the defendants demonstrates the existence of a de facto merger.[2] As such, Reardon is a "Named Insured" or "Insured" under the policies at issue and its claims were subject to the aggregate limits.

---

[2]Even if this court had determined that the second factor, a continuity of stock ownership, was not satisfied in the present case, the result would be no different.  The totality of the circumstances, as demonstrated by the other three factors, still indicate that the 1966 transaction constituted a de facto merger.

2.  *Whether the Defendants Exhausted the Mt. McKinley Aggregate Liability Limits*

The plaintiffs and Mt. McKinley agree that Mt. McKinley's aggregate limits total $39 million and that Mt. McKinley has paid in excess of $39 million into an attorney trust account. From the attorney trust account, the plaintiffs' attorney Glenn Bowers ("Bowers") and his law firm, Bowers Orr LLP ("Bowers Orr"), made disbursements of settlement proceeds to counsel for the claimants in the underlying case.  For many years, the plaintiffs behaved as though Mt. McKinley had fulfilled its legal obligations.  The plaintiffs now claim that Mt. McKinley's tendering of money into the attorney trust account did not satisfy Mt. McKinley's indemnity obligations or its duty to defend.  The plaintiffs claim that an insurer cannot terminate its duty to defend by unilaterally tendering its policy limits absent a judgment or settlement.  The plaintiffs offer several cases in support of that proposition.  *See Nat'l Cas. Co. v. Ins. Co. of N. Am.*, 230 F. Supp. 617 (N.D. Ohio 1964) (finding that insurer cannot avoid its duty to defend simply by tendering policy limits into court); *Aetna Cas. & Sur. Co. v. Sullivan*, 33 Mass. App. 154 (1992) (duty to defend not terminated where insurer tendered policy limits to litigant pursuant to a settlement, but did not obtain a release), *Pareti v. Sentry Indem. Co.*, 536 So. 2d 417, 424 (La. 1988) (cautioning that "any payment of the policy limits which does not release the insured from a pending claim (e.g., unilateral tender of policy limits to the court, the claimant or the insured), even if sufficient to terminate the duty to defend under the wording of the policy involved, raises serious questions as to whether the insurer has discharged its policy obligations in good faith").

Because a small portion of the funds remains undistributed in the trust and are not allocable to any enforcement settlement, the plaintiffs claim that the aggregate limits have not been reached

and that Mt. McKinley is still under an obligation to defend the plaintiffs.  The continuing defense costs currently exceed $57 million.

This court is unpersuaded by the plaintiffs' argument.  The cases cited by the plaintiffs are distinguishable from the facts at hand because those cases involve insurers unilaterally depositing indemnity payments into trust funds to avoid paying continuing defense costs.  Here, Mt. McKinley made the deposits at the request of and with the knowledge of the plaintiffs.  Mt. McKinley declared exhaustion of its policies to the plaintiffs.  Upon notification that the deposits were made and the coverage was exhausted, the plaintiffs sought coverage from carriers who provided them with excess coverage above the exhausted aggregate limits.  Several years passed before the plaintiffs informed the defendants that minimal funds remained in the attorney trust account and that Mt. McKinley was liable for $57 million in continuing defense costs.  Nothing in the facts suggests that Mt. McKinley unilaterally paid the aggregate limit of $39 million to avoid its obligation to defend the plaintiffs.  This court, therefore, finds that the plaintiffs exhausted their aggregate liability limits under the Mt. McKinley policies once Mt. McKinley tendered $39 million into the attorney trust account.

In addition, Mt. McKinley claims that it made an overpayment of $231,073.33 in indemnity.  This overpayment relates to litigation involving Gates Engineering, a subsidiary of RPM.  After Gates Engineering went bankrupt, litigation concerning damages suffered as a result of the failure of a Gates Engineering product ensued.  Mt. McKinley contributed $231,073.33 to resolve the claim through settlement.  Mt. McKinley informed the plaintiffs on five occasions that the payments had an impact on the aggregate limits, and the plaintiffs acknowledged as much.

An affirmative defense of laches requires a party to prove an inexcusably long delay in commencing the action which causes prejudice to the other party.  Under Ohio law, the elements of

-17-

laches are (1) unreasonable delay or lapse of time in asserting a right, (2) absence of an excuse for the delay, (3) knowledge, actual or constructive, of the injury or wrong, and (4) prejudice to the other party. *State ex rel. Polo v. Cuyahoga Cty. Bd. of Elections,* 74 Ohio St.3d 143, 145 (1995). After having been given five opportunities to object by Mt. McKinley, the plaintiffs cannot now claim that such payments were improperly applied towards the aggregate limits because the claim is barred by the doctrine of laches.

Because the court has found that the claims were properly categorized as products hazard claims and that the payments into the attorney trust account exceeded $39 million, this court must find that the Mt. McKinley  policies were exhausted.

3.      *Whether the Defendants Exhausted the Century, Columbia, Continental and Allstate Aggregate Liability Limits*

This court notes that the plaintiffs have only argued that the Allstate, Century, Continental, and Columbia policies' aggregate limits have not been exhausted because the claims were improperly categorized as products hazards claims.  The plaintiffs have not argued that the Century, Columbia, Continental or Allstate policies' aggregate limits have been exhausted *even if* the claims were properly categorized as products hazards claims.  Because the court has found that the claims were properly categorized as products hazard claims, this court must find that the Century, Columbia, Continental and Allstate policies were exhausted.

This court has determined that Reardon is a "Named Insured" or "Insured" under the policies and that the defendants have adequately demonstrated that the aggregate limits of liability under the policies have been reached.  The plaintiffs have failed to present any evidence creating a genuine

-18-

issue of material fact.  Accordingly, defendants' motions for summary judgment are granted with respect to the issues involved in Counts 3 and 6 of the plaintiffs' complaint.

### D.      *Analysis of Remaining Counts*

#### 1.      *Counts 4, 5, 8, and 10*

As previously stated, the defendants' motions for summary judgment on Counts 3 and  6 of the complaint are granted.  This finding resolves the claims made by the plaintiffs in Counts 4, 5, 8, and 10 of the first amended complaint.  In Counts 4 and 5, the plaintiffs seek declaratory judgment against Mt. McKinley, stating that Old Reardon, the Reardon Division, and Republic are covered by each of the Mt. McKinley policies and are not subject to any aggregate limit of liability.  In Count 8, the plaintiffs claim that Mt. McKinley breached its duty to defend and its duties of good faith and fair dealing by failing to pay the agreed upon portion of the plaintiffs' defense costs.  Finally, the plaintiffs in Count 10 allege similar breaches of duties to defend and indemnify against all the defendants except Allstate.  Because this court has found that Reardon was covered by the policies, that claims were properly categorized as products hazard claims, that aggregate limits of the policies had been reached, and that the defendants were no longer under a duty of indemnification, this court grants summary judgment in favor of Mt. McKinley on Counts 4, 5, and 8 and in favor of all defendants on Count 10.

#### 2.      *Count 2*

In Count 2 of the first amended complaint, the plaintiffs seek declaratory judgment against all of the defendants except Hartford stating that each claimant's exposure to asbestos fibers emanating from Reardon products constitutes a separate occurrence subject to a separate occurrence limit of liability.  Because this court has applied the doctrine of de facto merger to find that the

-19-

liability limits have been exhausted, the issues relating to the number of occurrences found in Count 2 are moot.

>    3.      *Counts 1 and 7*

In Count 1, the plaintiffs seek declaratory judgment against Hartford.  In Count 7, the plaintiffs allege that Hartford breached its duty of good faith and fair dealing.  Because Hartford and the plaintiffs have settled with each other, the claims alleged in Counts 1 and 7 are moot.

>    4.      *Count 9*

In Count 9, the plaintiffs seek declaratory judgment against Mt. McKinley stating that Mt. McKinley has not made an overpayment of $231,073.33 in indemnity.  For the reasons already stated above, this court finds that Mt. McKinley did make an overpayment of $231,073.33 in indemnity.

## II.      **Traveler's Motion for Summary Judgment**

Defendants agree that their claims against USF&G and Travelers are contingent upon the plaintiffs' success against the defendants.  Because the plaintiffs were not successful against the defendants in the action, USF&G and Travelers' motion for summary judgment is granted.

## III.     **Allstate Counterclaims**

Allstate filed a counterclaim [Doc. No. 326] requesting that:

> . . . in the event there is a finding by this Court that some or all of the asbestos bodily injury claims that are the subject of this lawsuit were not, or are not, subject to the aggregate limits of liability of the Underlying Policies, the Court enter a judgment: (a) requiring Plaintiffs to reimburse Northbrook for all indemnity payments for which Northbrook had no obligation because underlying insurance coverage was not exhausted when Northbrook made such payments; (b) declaring that Northbrook has no obligation to indemnify Plaintiffs with respect to any asbestos bodily injury claims unless and until the applicable limits of liability of any and all Underlying Policies are exhausted; (c) requiring that Plaintiffs pay Northbrook equitable restitution for all indemnity payments for which Northbrook had no obligation because underlying

insurance coverage was not exhausted when Northbrook made such payments; (d) awarding Northbrook its attorneys' fees, costs and prejudgment interest, to the extent allowed by law, and such other and further relief as the Court may deem just and proper.

Both parties recognize that Allstate's success in its counterclaim is contingent upon this court finding that the aggregate limits do not apply.  Because this court has found that the aggregate limits do apply, this court therefore grants the plaintiffs judgment as a matter of law on the counterclaim asserted by Allstate.

## IV.     Mt. McKinley Counterclaim

### A.     *Background*

On March 19, 2007, Mt. McKinley filed an amended counterclaim [Doc. No. 643] against the plaintiffs.  In Count 1, Mt. McKinley seeks declaratory judgment stating that its policies have been exhausted.  In Count 2, Mt. McKinley seeks that the court declare the amount and person or entity to whom $509,020.71 in defense expenses should be directed.  Moreover, Mt. McKinley requests that it be permitted to pay that amount to the court pursuant to Federal Rule of Civil Procedure 67.  In Count 3, Mt. McKinley seeks reimbursement of $231,073.33, claiming that the sum amounts to an overpayment  of the applicable policy limits.  Counts 4 and 5 are contingent upon this court finding that the aggregate limits have not been reached.  In Count 6, Mt. McKinley seeks damages for fraud and/or constructive fraud as well as attorneys fees, costs and expenses.  In Count 7, Mt. McKinley seeks damages for the plaintiffs' alleged breaches of fiduciary duty as well as attorneys fees, costs and expenses.

### B.     *Standard*

Federal Rule of Civil Procedure 12(b)(6) allows for the dismissal of a complaint that fails to state a claim upon which relief may be granted.  The complaint, for purposes of a 12(b)(6) motion, is

-21-

to be construed in the light most favorable to the nonmoving party and its allegations taken as true.

*See Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995).  While the complaint does "not need detailed

factual allegations," a plaintiff has an "obligation to provide the grounds of his entitlement to relief."

*Bell Atlantic Corp. Twombly*, 127 S.Ct. 1955, 1964-65 (2007) (internal quotes and citations

omitted).  "The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law,

the plaintiff is entitled to legal relief even if everything alleged in the complaint is true."  *Mayer v.*

*Mylod*, 988 F.2d 635, 638 (6th Cir. 1993).

> Under Ohio law, the elements of common law fraud are:
>
> (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false ..., (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Gaines v. Preterm-Cleveland, Inc.*, 33 Ohio St.3d 54, 514 N.E.2d 709, 712 (1987).  In addition, Ohio

law defines the elements of a breach of fiduciary duty as follows: "The elements for a breach of

fiduciary duty claim are: (1) the existence of a duty arising from a fiduciary relationship; (2) a

failure to observe the duty; and (3) an injury resulting proximately therefrom."  *Camp St. Mary's*

*Ass'n of the W. Ohio Conference of the United Methodist Church, Inc. v. Otterbein Homes*,

2008-Ohio-1490, 2008 WL 836117, at *5 (Ohio Ct.App.2008).  Federal Rule of Civil Procedure

9(b), requires that "[i]n alleging fraud or mistake, a party must state with particularity the

circumstances constituting fraud or mistake."  In addition, when an alleged breach of fiduciary duty

is predicated upon a fraud, a party must also plead with particularity.  *Concha v. London*, 62 F.3d

1493, 1503 (9th Cir.1995), cert. dismissed, 517 U.S. 1183 (1996); *see also Shirk v. Fifth Third*

*Bancorp*, 2008 WL 4449024, No. 05-cv-049, at *17 (S.D. Ohio Sept. 26, 2008).

-22-

### C.      *Analysis*

As previously stated, this court finds that the plaintiffs have exhausted the Mt. McKinley

policies and that Mt. McKinley is entitled to reimbursement of the contested $231,073.33.

Consequently, this court must enter judgment as a matter of law against the plaintiffs in Counts 1

and 3.  Furthermore, this court also enters judgment as a matter of law in Mt. McKinley's favor on

Count 2 and directs Mt. McKinley to deposit $277,947.38 into the registry of the court pursuant to

Local Rule 67.1 and a forthcoming order.  This sum represents the defense costs owed by Mt.

McKinley to the plaintiffs ($509,020.71) less the overpayment made by Mt. McKinley into the

attorney trust account ($231,073.33).  Given their contingent natures, Counts 4 and 5 are moot.

Counts 6 and 7 involve claims of fraud and breach of fiduciary duty, which the plaintiffs seek

to have dismissed pursuant to Rule 12(b)(6).  As previously stated, the plaintiffs and Mt. McKinley

both acknowledge that Mt. McKinley payed $39 million, the aggregate limit under the policies,  into

an attorney trust account from which Bowers and Bowers Orr made disbursements to counsel for

claimants in the underlying asbestos cases.  Initially, the plaintiffs behaved as though Mt. McKinley

had satisfied its obligations.  Later, Mt. McKinley adopted a new legal position wherein it claims

that the aggregate limits have not been reached and that Mt. McKinley is still under an obligation to

defend the plaintiffs as long as money remains undistributed in the trust account.  Because money

still remains undistributed and unallocated in the account, the plaintiffs claim that Mt. McKinley is

liable for $57 million in defense costs.

In the amended counterclaim, Mt. McKinley claimed that the plaintiffs committed fraud by

misrepresenting or failing to disclose its legal position.  In addition to alleging other elements of

fraud, Mt. McKinley alleged that it had suffered damages as a result of the fraud perpetrated by the plaintiffs.  Specifically, Mt. McKinley pled as follows:

> Mt. McKinley also has been injured by the misrepresentations and/or failure to disclose upon which it reasonably relied.  Based on the representations by Brittain and NCC, which Plaintiffs now claim were untrue, Mt. McKinley declared exhaustion, and subsequently stopped making defense payments, which Plaintiffs now claim was improper.  Mt. McKinley also incurred legal fees.
>
> As a result of the misrepresentation and/or failures to disclose for which Plaintiffs are liable, Mt. McKinley has suffered and continues to suffer damages, including legal fees, incidental and consequential damages.

In the amended counterclaim, Mt. McKinley has merely asserted without support that it suffered damages.  Mt. McKinley has failed to show what injury it has incurred or how it would have acted differently had it been aware of the plaintiffs' legal position.  An assertion of damages, without support, is insufficient to satisfy Rule 9(b).  Consequently, Counts 6 and 7 must be dismissed pursuant to Rule 12(b)(6) because the pleadings do not comply with Rule 9(b).

## V.    Mt. McKinley's Third-Party Complaint

On March 18, 2007, Mt. McKinley also filed a third-party complaint [Doc. No. 643] against Glen Bowers and Bowers Orr, LLP.  In Counts 1, 2, and 3, Mt. McKinley seeks damages for breaches of fiduciary duty against Bowers and Bowers Orr.  In Count 4, Mt. McKinley seeks damages for fraud and/or constructive fraud as well as attorneys fees, costs and expenses.  In Count 5, Mt. McKinley seeks damages for negligence against Bowers and Bowers Orr.  Finally, in Count 6, Mt. McKinley seeks an order requiring Bowers and Bowers Orr to provide a complete accounting of all indemnity payments that Mt. McKinley made to the attorney trust account.

Counts 1, 2, 3 and 4 of Mt. McKinley's claim against Bowers and Bowers Orr suffers from the same fatal flaw as its claim against the plaintiffs – a lack of the specificity required by Rule 9(b).

The  claims of breaches of fiduciary duty and fraud require specificity that is absent in the pleading. Nowhere has Mt. McKinley plead injury or damages with any specificity.

Count 5 alleges that the plaintiffs were negligent.  Under Ohio law, the elements of a cause of action for negligence are: (1) the existence of a legal duty; (2) the defendant's breach of that duty; (3) a resulting injury that is the proximate cause of the defendant's breach. *Mussivand v. David*, 45 Ohio St.3d 314, 318 (1989).  Here, Mt. McKinley has incurred no injury at all because it has not made a single payment beyond the $39 million that it was contractually required to pay.  A complete absence of damages is insufficient to sustain a negligence claim.  Consequently, this court grants summary judgment in favor of the plaintiffs on all counts contained within Mt. McKinley's third-party complaint..

## VI.     Conclusion

For the foregoing reasons, this court has granted all of the defendants' pending summary judgment motions [Doc. Nos. 551, 556, 573, 574, 586].  Consequently, this court has also denied all of the plaintiffs' pending summary judgment motions [Doc. Nos. 593, 594, 595, 596, 597].  This court has also granted USF&G and Travelers' pending summary judgment motion [Doc. No. 591] and the  motion to dismiss Mt. McKinley's amended counterclaim [Doc. No. 748] filed by the plaintiffs, Bowers, and Bowers Orr.  In addition, this court has granted judgment as a matter of law on all pending claims.  All requests for attorneys fees and costs by all parties are also denied.  As all pending claims have been resolved, the court thereby dismisses the action in its entirety.

This order is final and appealable.

IT IS SO ORDERED.

_____*/s/ Ann Aldrich*_____

-25-

ANN ALDRICH
UNITED STATES DISTRICT JUDGE

**Dated: December 1, 2008**